JOHN JOSEPH MUNOZ, JR.,

       Plaintiff,

v.                                   Case No. 18-cv-495-pp

MICHAEL ANDERSON, ROBERT VELEZ,
MEGHAN C. LINDBERG, REBECCA F. DALLET,
CITY OF MILWAUKEE, MILWAUKEE COUNTY,
and STATE OF WISCONSIN,

       Defendants.

## ORDER GRANTING THE PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYMENT OF THE FILING FEE (DKT. NO. 2) AND SCREENING THE PLAINTIFF'S COMPLAINT (DKT. NO. 1)

On March 28, 2018, the plaintiff filed a complaint under 42 U.S.C. §1983, alleging that the defendants had violated his civil rights by using excessive force, and subjecting him to cruel and unusual punishment during and after his arrest. Dkt. No. 1. He also alleged that the defendants were deliberately indifferent to his serious medical needs, that he was not afforded several hearings before his conviction, and that the defendants conspired to secure his guilty plea. Id. Along with the complaint, he filed a motion for leave to proceed without prepaying the filing fee. Dkt. No. 2. This decision resolves the plaintiff's motion and screens his complaint.

## I.    Motion to Proceed without Prepayment of the Filing Fee

The Prison Litigation Reform Act applies to this case because the plaintiff was incarcerated when he filed his complaint.[1] 28 U.S.C. §1915. That law allows a court to give an incarcerated plaintiff the ability to proceed with his lawsuit without prepaying the civil case filing fee, as long as he meets certain conditions. One of those conditions is that the plaintiff pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On March 30, 2018, the court ordered the plaintiff to pay an initial partial filing fee of $28.77. Dkt. No. 5. The court received that fee on April 11, 2018. The court will grant the plaintiff's motion for leave to proceed without prepayment of the filing fee, and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

## II.    Screening of the Complaint

The law requires the court to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint,

---

[1] When he signed his complaint in March 2018, the plaintiff indicated that he was in custody at the Milwaukee County Jail. Dkt. No. 1 at 53. On April 11, 2018, the court received a letter from the plaintiff, indicating that he had been moved from the Milwaukee County Jail to the Milwaukee County House of Corrections, dkt. no. 7 at 1. On June 6, 2018, the court received another letter, indicating that the plaintiff was out of custody, living in the city of Milwaukee, dkt. no. 8.

or part of it, if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

A claim is legally frivolous when it lacks an arguable basis either in law or in fact. Denton v. Hernandez, 504 U.S. 25, 31 (1992); Neitzke v. Williams, 490 U.S. 319, 325 (1989); Hutchinson *ex rel.* Baker v. Spink, 126 F.3d 895, 900 (7th Cir. 1997). The court may dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. Neitzke, 490 U.S. at 327. "Malicious," although sometimes treated as a synonym for "frivolous," "is more usefully construed as intended to harass." Lindell v. McCallum, 352 F.3d 1107, 1109-10 (7th Cir. 2003) (citations omitted).

To state a cognizable claim under the federal notice pleading system, the plaintiff must provide a "short and plain statement of the claim showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). It is not necessary for the plaintiff to plead specific facts, and his statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint that offers mere "labels and conclusions," however, or a "formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at

3

555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." Id. (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The complaint's allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citation omitted).

In considering whether a complaint states a claim, district courts follow the principles in Twombly, by first "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Legal conclusions must be supported by factual allegations. Id. Second, if there are well-pleaded factual allegations, the court must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that: 1) someone deprived him of a right secured by the Constitution or laws of the United States; and 2) the person who deprived him of that right was acting under color of state law. Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980). The court gives a *pro se* plaintiff's allegations, "however inartfully pleaded," a liberal

construction. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)).

A.    <u>Factual Allegations</u>

The plaintiff filed a fifty-three-page complaint, naming seven defendants. He does not get to the facts until page 13 of the complaint.

The plaintiff alleges that on April 8, 2012 (which he indicates was Easter Sunday), the mother of his children woke him up, "ranting and raving" because he had not had the kitchen cleaned up for the holiday, as he had promised. Dkt. No. 1 at 13. His downstairs neighbors called the police. <u>Id.</u> The police appeared about ten minutes later, and starting pounding on the front door. <u>Id.</u>

The plaintiff asserts that he believed the police were going to take him to jail, so he fled the apartment through the back door and maneuvered through the neighborhood. <u>Id.</u> at 14. Shortly after he fled, he saw a squad car go by, "presumably" searching for him, but he says they had no idea who he was or who they were looking for. <u>Id.</u> at 14-15. The plaintiff believes that the officers went back to the house and got a description of him from the mother of his children. <u>Id.</u> at 15.

The plaintiff says that officers "attempt[ed] to confront [him] and [he] dash[ed] through an open gate, through yards, gangways, alleys, and over fences trying to shake" the two officers who gave chase on foot. <u>Id.</u> at 15. He indicates that he lost those two officers, but that eventually too many other squads showed up, and they gave chase because he was the only person

5

running around the neighborhood early on Easter morning. Id. at 15-16. A squad blocked the mouth of the alley through which he was running, and by that point, the plaintiff was exhausted. Id. at 16.

The plaintiff states that an officer grabbed him, pushed him up against the officer's squad car, cuffed him and placed the plaintiff in the back of the car. Id. at 16. The plaintiff says that the group of officers who'd been chasing him congratulated each other; another squad then pulled up, and two more officers joined the conversation. Id.

One of those officers walked over to the squad, opened the door and asked the plaintiff to get out. Id. The plaintiff complied; he alleges that the officer then asked him, "So you like beating on your girl in front of your sons on Easter?," to which the plaintiff responded, "Excuse me?" Id. at 17. The plaintiff alleges that officer Michael Anderson (whom the plaintiff alleges was the officer who'd interviewed the mother of his children) then punched him in the face twice with a closed fist, and the other officers proceeded to "jump [him] and manhandle [him] throwing [him] to the ground and kicking and stepping all over [his] body." Id. at 17-18. He says that Anderson "shoved his knees into [the plaintiff's] back . . . and forced his forearm around the front of [the plaintiff's] neck purposely choking [the plaintiff]," as the other officers picked the plaintiff up. Id. at 18. The plaintiff states that Anderson dragged the plaintiff back to the squad car, still choking him, and slammed him against the car, yelling at the plaintiff to stop resisting over and over again. Id.

Another squad car arrived; the plaintiff states that Anderson "stop[ped] the acts against [him] and rushe[d] [him] over to the new squad car." Id. The plaintiff claims that Anderson was trying to make it look as if he had just apprehended the plaintiff a few moments earlier. Id. He says that Anderson shoved him into the second squad, and ordered the officer to take the plaintiff to "2nd district." Id. The plaintiff alleges that he was handcuffed before and during "the attack." Id. at 19.

Upon arriving in the sally port at the Second District police station, the plaintiff states that the officer driving the squad he was in parked the car, got out and began talking with other officers. Id. at 22. After a while, all of the squads involved in his pursuit and capture pulled in, the officers all gathered near the squad the plaintiff was in, mingled for a short while and then started to walk off. Id. The plaintiff states that when he asked them where they were going, they told him they were going inside the station for an Easter gathering. Id. at 22-23. The plaintiff told one of the officers not to leave him in the squad, and to put him in a cell. Id. at 23. The officer started to walk away, so the plaintiff yelled at him to at least roll the windows down, because it was hot inside the car. Id. The plaintiff says the officer ignored him and went inside the station. Id.

The plaintiff asserts the car began to heat up, so he started yelling for the officers to return, and kicking the inside of the car door. Id. According to the plaintiff, one officer came to the sally port and yelled for him to stop kicking the

door. Id. The plaintiff states that he told the officer that there was no need to keep him in the car, and to put him in a cell. Id. at 24. The officer started to walk away, so the plaintiff resumed kicking the car door. Id. The plaintiff states that the officer again yelled for him to stop, but the plaintiff kept kicking. Id. He says that other officers began to come out into the sally port and yell for him to stop kicking the car door. Id. The plaintiff says that "all the officers" were standing around, staring at him like they didn't know why he was kicking the door. Id.

The plaintiff asserts that the second district captain soon joined the other officers on the sally port and "began to abuse [him] along side the rest of the officers." Id. He says that the captain opened the squad car door, grabbed and held him down, and told "Officer Velez to get out his stungun to electrocute [the plaintiff]." Id. at 24-25. The plaintiff claims that the captain told Velez to let the captain know when Velez was going to electrocute the plaintiff, so that the caption could let go of the plaintiff first. Id. at 25. The plaintiff alleges that Officer Velez opened the other squad car door, got into position and told the captain he was going to fire; the captain let go, and Velez looked down into the squad and raised the stun gun. Id. The plaintiff states that at that moment, he "launched [his] body out of the squad car by placing both of [his] feet on the seat and kicking [himself] back with all [his] might before Officer Velez fire[d] his weapon." Id. The plaintiff opines that "[t]his work[ed] well," explaining that he came "rocketing" out of the back seat of the

8

squad car, causing him and the captain to "go crashing to the floor of the sallyport." Id. Speculating that the "visual must of looked freakishly cinematic" to the other officers, the plaintiff says that some of them went to help the captain and the others "jump[ed] all over [the plaintiff] kicking and [stepping] all over [his] body again and again" while yelling "stop resisting." Id. at 25-26.

The plaintiff alleges that during this physical attack a paddy wagon arrived. Id. at 26. He asserts that the captain broke up the attack and had the officers put the plaintiff in the paddy wagon; the plaintiff says that they did this, picking him up by his limbs and tossing his body into the wagon "like a sack of potatoes." Id. While the plaintiff was lying in the back of the wagon, he says that Officer Velez got in, "pretending to help [the plaintiff], so that [the plaintiff] don't asphyxiate while lying face down on [his] stomach." Id. Instead, however, the plaintiff says that Velez began to choke him, slam his head against the wall of the vehicle, "thrash[] [the plaintiff] from wall to wall and punch[] [the plaintiff's] body with closed fists like a punching bag." Id. at 26-27. The plaintiff assets that Velez switched back and forth between choking him and thrashing him against the walls several times. Id. The plaintiff says all he could do was allow his body go limp against the officers, but that this made Velez angrier. Id. Velez punched the plaintiff in the face with a closed fist; the plaintiff states that he became dazed and confused, and "fell into Officer Velez knocking him unbalanced." Id. at 27. He says that this enraged Velez to the

point that Velez "no longer knew what to do with his hands, and began to rip and tear at [the plaintiff's] clothing . . . ." Id.

The plaintiff states that the captain then pulled Officer Velez out of the wagon and instructed the officers who were driving the wagon to take the plaintiff to the county jail. Id. The plaintiff asserts that he was still cuffed throughout this second alleged attack. Id. at 28.

The plaintiff states that upon arriving at the sally port for the Milwaukee County Jail, the officers who were driving the paddy wagon started to abuse him. Id. at 31. He alleges that the driver "place[d] a black bag over [his] head and . . . [began] to choke [him] with the [bag's] strings . . . ." Id. at 31. According to the plaintiff, the officers pulled him out of the wagon, walked him to the end of the sally port and shackled his ankles so tightly that he couldn't walk. Id. The plaintiff alleges that the officers still attempted to force him to walk, causing him to "scream and holler in agony." Id. He states that the noise caused a female member of the medical staff to come out to the sally port and ask the officers what they were doing to the plaintiff. Id. at 32. The plaintiff asserts that the officers "ignored the nurse and continued with the abuse." Id. He says that the nurse went back inside the department building and got some sheriff's deputies to remove the plaintiff from the officer's custody. Id. The deputies took the plaintiff to the nurses' station to uncuff and unshackle him. Id. at 32.

The plaintiff explains that the nurses started to "register [his] wounds within [their] reports and took [his] vital signs and gave [him] two tablets of ibuprofen." Id. at 35, 39. The plaintiff opines that he should have been taken to the hospital, or at least to the jail infirmary, but that instead, he received no further treatment while he was in the jail. Id. at 35. He says that he couldn't walk for three days, and that he had migraines during his whole stay in the jail. Id. The plaintiff says that when the medical cart would come through, he could hear the nurse call to the inmates to receive their medications, but no one ever called his name, or stopped at his "number." Id. at 36. He asked the nurse if he was on the medication list; the nurse checked, and said that he wasn't. Id. The plaintiff says that he could walk, but that he was wracked with pain, was barely able to stand on his own, and didn't start feeling normal until "well into the third month" that he was in the jail. Id. at 36-37.

The plaintiff says that while he was in the jail, a captain came to take his statement about what had happened to him; he says, however, that he never heard anything again after that interview. Id. at 38. He thinks that the sheriff's department and the "higher up's" from the medical department were engaging in a coverup, to keep him from getting treatment and medical, and to prevent him from proving the injury the police officers had inflicted. Id. at 38-39.

The plaintiff also alleges that he was not allowed to speak with an attorney the whole time he was in custody. Id. at 40. He says, however, that

"out of the blue" on April 9, 2012, the day after he had been arrested and had suffered the three alleged attacks, a public defender came to see him. Id. The plaintiff states that the public defender told him that if he accepted the State's plea deal right then, they could be in court by 1:30 a.m. and the plaintiff would be out by the next day at 7:00 a.m. Id. The defender told the plaintiff that the judge had already agreed to the plea deal, and that it was "iron clad." Id. The plaintiff says that he knew he wasn't guilty of any crime, but that he accepted the deal (three years' probation) because he just wanted to go home and put it all behind him. Id. at 40-41.

The plaintiff alleges that Velez testified against him "in the hearing," and that everything Velez said was a lie. Id. at 41. He alleges that he found out later that the prosecutor was going to dismiss the case because of a lack of evidence, and because "the witness" wasn't cooperating. Id. He claims that the "judge was in on the plan along with the public defender;" that these people set him up to "take the bait" because they knew that he only wanted to go home. Id. He says that this plan among the judge, the prosecutor and the public defender induced his guilty plea by coercion. Id. at 41.

The plaintiff seeks compensatory and punitive damages. Id. at 5-10.

B.    The Court's Analysis

1.    *State of Wisconsin*

Despite his citation of pages of case law regarding liability as to various entitles, the State of Wisconsin cannot be held under §1983. Section 1983

allows a plaintiff to sue a "person" who, acting under color of law, violates his constitutional rights. The state of Wisconsin is not a person—it is not an individual subject to suit under §1983.[2] Andreola v. Wisconsin, 211 F. App'x 495, 497 (7th Cir. 2006) (citing Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 (1989)); 42 U.S.C. §1983. Further, the Eleventh Amendment to the Constitution "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities." Rao v. Gondi, Case No. 14-c-66, 2017 WL 4215889 at *1 (N.D. Ill. Jan. 11, 2017) (quoting Council 31 of the Am. Fed'n of State, Cnty. & Mun. Employees v. Quinn, 680 F.3d 875, 881 (7th Cir. 2012)). States can be sued only when Congress authorizes such a suit, or when the state "voluntarily waives 'its sovereign immunity by consenting to federal jurisdiction or by invoking that jurisdiction by its behavior.'" Id. (quoting Bd. of Regents of Univ. of Wis. Sys. V. Phoenix Int'l Software, Inc., 653 F.3d 448, 458 (7th Cir. 2011)). In other words, a lawsuit against a state "is barred by the Eleventh Amendment, unless [that state] has consented to the filing of such a suit." Alabama v. Pugh, 438 U.S. 781, 782 (1978) (collecting cases). The state of Wisconsin has not waived its sovereign immunity. Stoner v. Wis. Dept. of Agric., Trade and Consumer Prot., 50 F.3d 481, 483 (7th Cir. 1995) (citing Pugh, 438 U.S. 781)).

---

[2] The plaintiff indicates that he knows that Wisconsin is not a "person," and can't be sued for damages under §1983, but he says that he sued it anyway because "there is a substantial ancillary effect on the State's treasury." Dkt. No. 1 at 53. The court does not know what this means; effect on the treasury or not, Wisconsin cannot be held liable under §1983.

The court will dismiss the state of Wisconsin as a defendant.

2. *Heck* Barred Claims

The plaintiff does not give details of the case against him, other than to say that it happened in 2012, and to name as defendants Rebecca Dallet and Meghan Lindberg. A review of the Wisconsin Circuit Court Access Program, however, shows that on April 12, 2012, the plaintiff was charged in State v. Munoz, 2012CF001642 (Milwaukee County) with misdemeanor battery/domestic abuse, misdemeanor disorderly conduct (use of a dangerous weapon/domestic abuse), misdemeanor resisting or obstructing, and misdemeanor disorderly conduct. https://wcca.wicourts.gov (last visited September 7, 2018). The judge assigned to the case was Milwaukee County Circuit Judge Rebecca F. Dallet, and the prosecutor is listed as Meaghan C. Lindberg. The court assumes, therefore, that this is the case that arose from the events the plaintiff described.

This criminal case was pending in the Milwaukee County Circuit Court from April 12, 2012 through August 14, 2012, when the court entered judgment after the plaintiff pled guilty and was sentenced. Id. The docket shows that the plaintiff had a lawyer representing him. This means that he had the opportunity to challenge any parts of the court proceedings that he believed were inappropriate, both by challenging them while his case was pending and by appealing his conviction or sentence.

The plaintiff alleges toward the end of his complaint that he is stating "1st Amendment violations for denial of access to the courts because [he] never had an intake hearing, an arraignment hearing, a preliminary hearing or a pretrial hearing." Dkt. No. 1 at 46. He claims that he was "deprived life and liberty without due process of laws" and that he was deprived "a speedy trial and assistance of counsel." Docket No. 1 at 46-47. He cannot proceed on these claims in a §1983 case.

The First Amendment guarantee of access to the courts does not relate to *criminal* court proceedings; it relates to a person's right under the First Amendment "to petition the Government for a redress of grievances." U.S. CONST. AMEND. I, Bridges v. Gilbert, 557 F.3d 541, 553 (7th Cir. 2009). The right of access to courts guarantees a prisoner "access . . . to the courts for purposes of presenting their complaints." Id. (citations omitted). Prisoners state First Amendment access-to-courts claims when they allege, for example, that the jail or prison does not give them time for research in the law library, or does not allow them to file the papers they need to file in their lawsuits.

Here, the plaintiff is not alleging that he was denied the ability to go to court to pursue a grievance. Rather, he alleges that in his criminal prosecution, he was denied certain critical rights. The court does not disagree that the Constitution requires some of the proceedings and protections the plaintiff claims he didn't get. For example, the Supreme Court has held that an arraignment can be a critical stage of a criminal proceeding, so critical that

15

failure to provide an arraignment may require reversal of a defendant's conviction. <u>Hamilton v. State of Ala.</u>, 368 U.S. 52, 53-54 (1961). A court may dismiss a criminal case if it finds that his Sixth Amendment right to a speedy trial has been violated. <u>See</u> <u>United States v. Loera</u>, 565 F.3d 406 (7th Cir. 2009). A criminal defendant may attack his conviction on the ground that he did not receive his Sixth Amendment right to counsel. <u>See</u> <u>United States v. Sellers</u>, 645 F.3d 830 (7th Cir. 2011).

But if a criminal defendant believes that his prosecution, conviction or sentence took place because of a violation of any of these critical rights, he has a remedy: he can appeal. In the state of Wisconsin, he can appeal from the Circuit Court to the Wisconsin Court of Appeals; if he loses there, he can ask the Wisconsin Supreme Court to accept his case on a petition for review. He also has certain options in the circuit court, such as a state *habeas* petition or a post-conviction motion under Wis. Stat. §974.06. A criminal defendant can ask a court to overturn his conviction under any of these methods.

In federal court, there are two ways for a person who believes he has been wrongfully convicted in state court to challenge that conviction. The first is by filing a federal *habeas corpus* petition under 28 U.S.C. §2254. To do that, however, the plaintiff first must "exhaust" all his state remedies. In other words, he must appeal—all the way to the highest court in the state (here, the Wisconsin Supreme Court). The other way is to file a §1983 complaint, which the plaintiff has done here. But "in order to recover damages for allegedly

unconstitutional conviction or imprisonment, or for other harm whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck v. Humphrey, 512 U.S. 477, 487 (1994). In other words, a plaintiff can't skip the state criminal appeal process and just ask a federal court to reverse his conviction through a §1983 case. If a federal court finds that a judgment in favor of a §1983 plaintiff "would necessarily imply the invalidity of his conviction or sentence," the court must dismiss the claim unless the plaintiff can show that his conviction already has been invalidated. Id.

If the court were to find in the plaintiff's favor on his claims that he did not receive proper process in the 2012 Milwaukee County conviction, or that he was denied his right to certain constitutionally-mandated procedures or his right to counsel, that finding "necessarily would imply the invalidity of his conviction or sentence." Because the plaintiff has not showed (and cannot, since he didn't appeal) that that conviction or sentence already has been invalidated, he cannot proceed on these claims.

3. *Judicial Immunity and Absolute Prosecutorial Immunity*

The plaintiff also asserts that defendant Judge Rebecca F. Dallet, the judge who presided over the 2012 criminal case, conspired with defendant

17

Megan Lindberg, the district attorney, and the plaintiff's public defender (not a defendant) to coerce him into pleading guilty to something he says he did not do. The plaintiff's claims against these defendants are barred by judicial immunity and absolute prosecutorial immunity.

"Judges are generally entitled to absolute immunity from suit for their judicial conduct." Schneider v. Cty. of Will, 366 Fed. App'x 683, 684 (7th Cir. 2010) (citing Mireles v. Waco, 502 U.S. 9, 9 (1991)). "The [Supreme] Court explained that the 'touchstone' of judicial immunity has been 'performance of the function of resolving disputes between parties.'" Id. (quoting Burns v. Reed, 500 U.S. 478, 500 (1991)). A judge has absolute judicial immunity from suit if her "actions meet a two-part test: first, the acts must be *within the judge's jurisdiction*; second, these acts must be performed in the judge's *judicial capacity*." Dellenbach v. Letsinger, 889 F.2d 755, 759 (7th Cir. 1989) (citing Stump v. Sparkman, 435 U.S. 349, 356 (1978)).

Judge Dallet had jurisdiction over the criminal case against the defendant. While it is not clear what, exactly, the plaintiff believes Judge Dallet did to conspire with the prosecutor and the defense attorney—he says only that she was "in on the plan"—the record indicates that she accepted the plaintiff's guilty plea. That action was squarely within her capacity as a judge. Judge Dallet is absolutely immune from suit, and the plaintiff's claims against her fail

18

to state a claim on which relief may be granted under §1983. The court will dismiss Judge Dallet.[3]

The court also will dismiss defendant Lindberg. Over forty years ago, the Supreme Court held that a prosecutor is absolutely immune from suit for "prosecutorial actions that are 'intimately associated with the judicial phase of the criminal process.'" <u>Van de Kamp v. Goldstein</u>, 555 U.S. 335, 341 (2009) (quoting <u>Imbler v. Pachtman</u>, 424 U.S. 409, 431 (1976)). The Supreme Court has held that "absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, or appears in court to present evidence in support of a search warrant application." <u>Van de Kamp</u>, 555 U.S. at 343 (citing <u>Burns v. Reed</u>, 500 U.S. 478, 492 (1991), <u>Kalina v. Fletcher</u>, 522 U.S. 118, 126 (1997)). It has held that a prosecutor is absolutely immune from claims that his or her failure to supervise and train subordinates resulted in a failure to turn over constitutionally-mandated impeachment evidence. <u>Id.</u> at 344. The Court has applied such absolute immunity in cases where the prosecutor presents false evidence, <u>Burns</u>, 500 U.S. at 490, willfully suppresses exculpatory evidence, <u>Imbler</u>, 424 U.S. at 431 n.34, or acts maliciously, in excess of his authority, or in a manner flawed by grave procedural error, <u>John v. Barron</u>, 897 F.2d 1387, 1391 (7th Cir. 1990). "Negotiating a plea agreement .

---

[3] The plaintiff also alleges that Judge Dallet's actions violated "Article III judges holding their office in good behavior." Dkt. No. 1 at 41. Article III of the Constitution vests the judicial power of the *United States*—the federal government—in federal judges who hold their offices for good behavior. It does not apply to state-court judges.

. . constitutes conduct intimately associated with the judicial phase of the criminal process," <u>Hansborough v. Reickhoff</u>, 400 F. Supp.2d 1100, 1102 (N.D. Ind. 2005), so Lindberg has absolute immunity for her participation in that process.

4.    *Deliberate Indifference Claim*

The Fourteenth Amendment's due process clause, rather than the Eighth Amendment's prohibition against cruel and unusual punishment, applies to pretrial detainees; a court analyzes a pretrial detainee's Fourteenth Amendment claim of deliberate indifference, however, under the same standard as claims under the Eighth Amendment. <u>Cavalieri v. Shepard</u>, 321 F.3d 616, 620 (7th Cir. 2003) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n.16 (1979)). To state a claim of deliberate indifference to serious medical needs, a plaintiff must demonstrate that he had an "objectively serious" medical need or harm, and that a particular defendant was deliberately indifferent to that need or harm. <u>Id.</u> (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994)).

The plaintiff alleges that because the officers choked him, beat him and electrocuted him, he had various wounds and injuries, couldn't walk for days and suffered constant migraines. The court will assume, for the purposes of screening, that the plaintiff has alleged that he had an objectively serious medical condition. But the plaintiff does not allege that any of the defendants he has named knew of, and were deliberately indifferent to, that medical condition. He makes general allegations that he wasn't taken to the hospital,

that he wasn't given any treatment while he was in the jail, that he "hobbled" to the med cart and begged for medications but did not receive any, and that he didn't receive medications when the med cart came around (even though other inmates did). But he does not say *who* refused to take him to the hospital, or who refused to give him treatment, or who refused to give him medication. To state a claim that someone violated his civil rights, the plaintiff must demonstrate that a particular defendant personally deprived him of that right. See George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible.").

The plaintiff has named Milwaukee County as a defendant, and the Milwaukee County Jail is an arm of Milwaukee County. See Abraham v. Piechowski, 13 F. Supp.2d 870, 877-79 (E.D. Wis. 1998); Howard v. Terry, No. 05-C-0635, 2010 WL 1404376, at *13 (E.D. Wis. Mar. 31, 2010), aff'd, 527 F. App'x 507 (7th Cir. 2013). To state a §1983 claim against a government entity, however, a plaintiff must show that he was deprived of his civil rights due to the "execution of a government's policy or custom." Monell v. Dep't of Soc. Serv's of City of New York, 536 U.S. 658, 694 (1978). The plaintiff has not alleged that the County had a policy or custom of denying inmates medical treatment. The court will dismiss the County as a defendant.

The plaintiff says that he couldn't identify all the officers involved in the events without the help of discovery. It may be that discovery will help him identify some of the individuals involved in his deliberate indifference claims.

The court will allow him to proceed on a deliberate indifference claim against John/Jane Doe medical staff; if he learns the identities of the involved medical staff during discovery, the plaintiff may file a motion asking the court to substitute the names of the actual defendants for the John/Jane Doe placeholders. See Donald v. Cook Cty. Sheriff's Dep't, 95 F.3d 548, 555-556 (7th Cir. 1996) (reminding district courts of their "special responsibility" to give *pro se* plaintiffs ample opportunity to amend their complaints to state claims).

After the defendants' attorney files an appearance, the plaintiff may serve discovery on the named defendants (by mailing his discovery requests to their attorney at the address in the attorney's notice of appearance) to obtain information that will help him identify the real names of the John Doe defendants. For example, the plaintiff may serve interrogatories (written questions) under Fed. R. Civ. P. 33 or document requests under Fed. R. Civ. P. 34.

After the plaintiff identifies the real names of the John Doe defendants, he must file a motion, asking the court to substitute the real names for the John Doe placeholders. (The plaintiff does not have to amend his complaint to accomplish this; he needs only file a motion asking to substitute the real names for the Doe placeholders.) Once the plaintiff identifies the John Doe defendants and they have had an opportunity to respond to his complaint, the court will issue a scheduling order, setting deadlines for the completion of all other discovery and for filing dispositive motions. The plaintiff should not start

the general discovery process until after he has identified all of the defendants, all of the defendants have filed their answers, and the court has issued a scheduling order.

        5.   *Excessive Force Claim*

An excessive force claim by a pretrial detainee[4] arises under the Fourteenth Amendment right to due process, not the Eighth Amendment's ban on cruel and unusual punishment. See Brown v. Budz, 398 F.3d 904, 910 (7th Cir. 2005); Butera v. Cottey, 285 F.3d 601, 605 (7th Cir.2002); Pardue ex rel. Estate of Cole v. Fromm, 94 F.3d 254, 259 n.1 (7th Cir.1996). To state a Fourteenth Amendment excessive force claim, a plaintiff "must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466, 2473 (2015). A court decides whether the force was objectively unreasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citations omitted). Courts look at various factors to determine whether the force was objectively unreasonable: "the relationship between the need for the use of

---

[4] A plaintiff may also state an excessive force claim under the Fourth Amendment to the Constitution, if the conduct giving rise to the claim occurred before the plaintiff was arrested. Graham v. Connor, 490 U.S. 386, 394 (1989) ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ."). The court construes the plaintiff's facts, however, as alleging that the officers subjected him to excessive force after they had arrested him.

force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. (citation omitted).

At this stage, the plaintiff has stated sufficient facts to allow him to proceed on a Fourteenth Amendment claim of excessive use of force against Anderson and Velez. The plaintiff's facts indicate that these officers subjected him to more force than was reasonably necessary under the circumstances. Because the plaintiff indicates that he doesn't know the names of the other officers involved in the events he describes, the court will add as defendants John Doe police officers, who also engaged in the allegedly unreasonable acts against the plaintiff. See Donald, 95 F.3d at 555–56. The plaintiff may use the discovery process to try to learn the names of these defendants, in the same way he may use that process to try to learn the names of the medical staff Doe defendants.

6.      *Claims against City of Milwaukee*

The court already has dismissed Milwaukee County as a defendant. It will dismiss the City of Milwaukee as a defendant for the same reason. A local governing body may be liable for monetary damages only "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an

official with final policy-making authority." <u>Thomas v. Cook Cty. Sheriff's Dept</u>, 604 F.3d 293, 303 (7th Cir. 2009) (citing <u>Monell</u>, 436 U.S. at 690); <u>Shields v. Ill. Dep't of Corr.</u>, 746 F. 3d 782, 789-90 (7th Cir. 2014).

The plaintiff alleges that he was injured by officers employed by the City of Milwaukee's police department, an agency of the City of Milwaukee. <u>Morehead v. Milwaukee Cty. Police Dep't</u>, No. 17-CV-1320-PP, 2018 WL 1175356, at *2 (E.D. Wis. Mar. 5, 2018). He has not, however, identified any offensive city policy that harmed him, he has not alleged that there was some unconstitutional city practice or custom that harmed him, and he has not identified an official with policy-making authority who caused him harm. The court will dismiss the City of Milwaukee as a defendant.

7. *Statute of Limitations*

The events that give rise to the plaintiff's complaint took place on Easter Sunday, 2012. He filed his §1983 complaint with this court on March 28, 2018—just days short of six years later. Toward the end of his complaint, the plaintiff stated, "Plaintiff request the benefit of federal doctrine of equitable tolling which 'permits a plaintiff to avoid the bar of the statute of limitations if [despite] all due diligence he is unable to obtain vital information bearing on the existence of his claim,' may be available in addition to state tolling rules." Dkt. No. 1 at 52 (citing <u>Smith v. City of Chi. Heights</u>, 951 F.3d 834, 839 (7th Cir. 1992) (quoting <u>Cada v. Baxter Healthcare Corp.</u>, 920 F.2d 446, 451 (7th Cir. 1990)).

The plaintiff's equitable tolling request is premature, and the court will not rule on it here. If, in response to the complaint, the defendants ask the court to dismiss the plaintiff's claims as barred by the applicable statutes of limitation, the court will give the plaintiff the opportunity to respond to such a request. The court will rule after it has heard from all parties, not before.

## III.  Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepayment of the filing fee. Dkt. No. 2.

The court **DISMISSES** Meghan C. Lindberg, Rebecca F. Dallet, the City of Milwaukee, Milwaukee County and the State of Wisconsin as defendants.

The court **ORDERS** the clerk's office to add as defendants John/Jane Doe medical staff and John/Jane Doe police officers.

The court **ORDERS** that the United States Marshal shall serve a copy of the complaint and this order on Michael Anderson and Robert Velez under Federal Rule of Civil Procedure 4. The court advises the plaintiff that Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for these fees to be waived either by the court or by the U.S. Marshals Service. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals will

give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** the defendants to file a responsive pleading to the complaint.

The court **ORDERS** that, in time for the court to receive it by the end of the day on **Friday, November 16, 2018**, the plaintiff either shall file a motion asking the court to substitute the names of the Doe defendants, or file a letter explaining why he is unable to do so. If the court does not receive either of these things from the plaintiff by the end of the day on Friday, November 16, 2018, the court may dismiss his claims against those defendants based on his failure to diligently pursue them. Civil L.R. 41(c).

The court **ORDERS** that the plaintiff shall pay the $292.46 balance of the filing fee over time, as he is able. The plaintiff may pay in person by bringing the money to the clerk's office, 517 East Wisconsin Avenue, Room 362, Milwaukee, Wisconsin 53202, Monday through Friday between the hours of 8:30 a.m. and 4:30 p.m.; he may bring cash, a personal check or money order or cashier's check made payable to Clerk, U.S. District Court, or a credit card. He may send a check by mailing it to the clerk's office at that same address. He may pay by credit card over the phone, by calling 414-297-3417 Monday through Friday between the hours of 8:30 a.m. and 4:30 p.m. and asking for the cashier.

The court **ORDERS** that the parties may not begin all other discovery until after the court enters a scheduling order setting deadlines for such discovery and dispositive motions.

The court **ORDERS** the plaintiff to submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the matter. The court advises the plaintiff that if he does not file documents or take other actions by the deadlines the court imposes, the court may dismiss his case for failure to prosecute. The parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated in Milwaukee, Wisconsin, this 11th day of September, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**